UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JOHN S[1].,                          )
                                     )
                    Plaintiff,       )
                                     )
            v.                       )       No. 1:19-cv-01008-DLP-JRS
                                     )
ANDREW SAUL,                         )
                                     )
                    Defendant.       )

## ORDER

Plaintiff John S. seeks judicial review of the denial by the Commissioner of

the Social Security Administration ("Commissioner") of his application for Social

Security Disability Insurance Benefits ("DIB") under Title II of the Social Security

Act ("the Act"). *See* 42 U.S.C. §§ 423(d), 405(g). For the reasons set forth below, this

Court hereby **AFFIRMS** the ALJ's decision denying the Plaintiff benefits.

## I.    PROCEDURAL HISTORY

On March 26, 2015, John filed an application for Title II disability and

disability insurance benefits, alleging a disability onset date of August 1, 2012. The

claim was denied initially on September 16, 2015, and on reconsideration on

January 7, 2016. John filed a written request for hearing on February 12, 2016,

which was granted. On October 26, 2017, Administrative Law Judge ("ALJ") Jody

---

[1] In an effort to protect the privacy interests of claimants for Social Security benefits, the Southern District of Indiana has adopted the recommendations put forth by the Court Administration and Case Management Committee of the Administrative Office of the United States Courts regarding the practice of using only the first name and last initial of any non-government parties in Social Security opinions. The Undersigned has elected to implement that practice in this Order.

Hilger Odell conducted a hearing, where John and vocational expert Sharon Ringenberg testified. On February 27, 2018, ALJ Odell issued an unfavorable decision finding that John was not disabled. Dkt. 7-2 at 27, R. 26. The Appeals Council denied John's request for review of the ALJ's decision on January 15, 2019, making the ALJ's decision final. Dkt. 7-2 at 2, R. 1. John now requests judicial review of the Commissioner's decision. *See* 42 U.S.C. § 1383(c)(3).

## II.  STANDARD OF REVIEW

To prove disability, a claimant must show he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a claimant's impairments must be of such severity that he is not able to perform the work he previously engaged in and, based on his age, education, and work experience, he cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520. The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [her] unable to perform

[her] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352. If a claimant satisfies steps one or two, but not three, then he must satisfy step four. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)*; see also* 20 C.F.R. § 404.1520 (A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled).

After step three but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id.* The ALJ uses the RFC at step four to determine whether the claimant can perform his own past relevant work and, if not, at step five to determine whether the claimant can perform other work in the national economy. *See Knight*, 55 F.3d at 313; *see also* 20 C.F.R. § 404.1520(iv), (v). The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then establish that the claimant—in light of his age, education, job experience, and residual functional capacity to work—is capable of

performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

The Court reviews the Commissioner's denial of benefits to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Evidence is substantial when it is sufficient for a reasonable person to conclude that the evidence supports the decision. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether John is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

In this substantial-evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, she must build an "accurate and logical bridge from the evidence to [the] conclusion," *Clifford*, 227 F.3d at 872, articulating a

minimal, but legitimate, justification for her decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in her decision, but cannot ignore a line of evidence that undermines the conclusions she made, and she must trace the path of her reasoning and connect the evidence to her findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford,* 227 F.3d at 872.

## III. BACKGROUND

### A. Factual Background

John was 54 years old as of his alleged onset date and is now 61 years old. Dkt. 7-3 at 2, R. 52. John completed two years of college. Dkt. 7-3 at 7, R. 57. He has past relevant work history as a restaurant manager. Dkt. 7-2 at 26, R. 25.

### B. Medical History

On April 3, 2012, John underwent an overnight polysomnogram[2] that revealed severe complex sleep apnea with severe nighttime oxygen desaturation, for which he was prescribed a continuous positive airway pressure ("CPAP") machine. Dkt. 7-7 at 14, R. 245.

On June 5, 2012, John returned to his treating cardiologist, Dr. Deovrat Singh with Community Heart and Vascular Care, for a follow-up on his coronary artery disease.[3] Dkt. 7-7 at 45, R. 276. Dr. Singh noted that in March 2012, John

---

[2] Polysomnography is a sleep study used to diagnose sleep disorders. *Polysomnography*, https://medlineplus.gov/ency/article/003932.htm.
[3] Coronary artery disease is a blockage or narrowing of the arteries that supply blood to the heart muscle, often due to a buildup of fatty plaque inside the arteries. *Coronary Artery Disease*,

underwent a coronary artery bypass graft surgery.[4] Id. Dr. Singh further noted that

he had also performed a prior percutaneous coronary intervention[5] on John at some

point in 2007. Dkt. 7-7 at 64, R. 295. During the visit, John denied any shortness of

breath, edema, snoring, or apnea, and Dr. Singh noted that John was actively doing

his cardiac rehabilitation and was now asymptomatic, meaning that he was

approved to return to work. Id. at 45, 47, R. 276, 278.

On November 13, 2013, John presented to Dr. Andrew Houston to establish

primary care. Dkt. 7-7 at 92, R. 323. John reported a history of coronary artery

disease, hypercholesterolemia, hypertension, diabetes mellitus, and obstructive sleep

apnea. Id. Dr. Houston assigned diagnoses of diabetes, hyperlipidemia, hypertension,

coronary artery disease, fatigue, and obstructive sleep apnea. Id. at 93, R. 324. John

was sent for a two-day myocardial perfusion scan, which showed a moderate sized

reversible defect in the distal anterior septum and a dilated left ventricle with a left

ventricle ejection fraction of 56%. Dkt. 7-7 at 35, R. 266.

On November 19, 2013, John followed up with Dr. Singh for his coronary

artery disease. Dkt. 7-7 at 35, R. 266. John denied having paroxysmal nocturnal

dyspnea (attack of shortness of breath), orthopnea (shortness of breath while lying

---

https://www.hopkinsmedicine.org/heart_vascular_institute/conditions_treatments/conditions/coronary
_artery.html.

[4] Coronary artery bypass graft surgery is a procedure used to treat coronary artery disease. It uses
blood vessels from another part of the body and connects them to blood vessels above and below the
narrowed artery, which bypasses the narrowed or blocked coronary arteries. *What is coronary bypass
graft surgery?* https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/coronary-
artery-bypass-graft-surgery.

[5] Percutaneous coronary intervention (angioplasty) is a procedure used to open blocked coronary
arteries. A special catheter is inserted into a blood vessel and guided to the blockage; a tiny balloon
within the catheter is inflated to press the blockage to the sides and allow for more blood flow. *What is
angioplasty?* https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/angioplasty-and-
stent-placement-for-the-heart.

down), palpitations, dizziness, snoring, wheezing, or nighttime apnea. Id. Dr. Singh indicated that John had extreme obesity, significantly elevated blood pressure, and mild edema, which could be indicative of diastolic heart failure. Dkt. 7-7 at 36, R. 267. Given John's lack of symptoms, Dr. Singh elected to treat him medically, which included a medication regimen, diet, and exercise. Id.

On December 18, 2013, John followed up with a nurse practitioner in Dr. Houston's office, Mary Arnold, for his coronary artery disease and hypertension. Dkt. 7-7 at 31, R. 262. John reported that his energy level had improved since he started a new testosterone replacement and denied any chest pain, shortness of breath, edema, palpitations, dizziness, or syncope. Id. at 32, R. 263. He was diagnosed with coronary artery disease with no chest pain, status post coronary artery bypass graft, chronic diastolic congestive heart failure, and obesity, and advised to follow up with Dr. Singh in six months, or to call sooner if any chest pain occurred. Id. at 33-34, R. 264-65.

John returned to Dr. Houston on June 5, 2015 for a follow-up on his diabetes mellitus. Dkt. 7-8 at 5, R. 335. Dr. Houston noted that John's diabetes was out of control and prescribed a new medication. Id. at 6, R. 336.

At the request of the SSA, on July 6, 2015, John presented to Dr. Mohammed Majid at Greenwood Pediatrics and Internal Medicine for a consultative exam. Dkt. 7-10 at 10, R. 471. John reported chest pain that occurred every few weeks as a result of exercise, stress, and at rest and obstructive sleep apnea that left him with no energy and shortness of breath. Id. at 10-11, R. 471-72. On physical exam, John had a normal gait, could walk on his heels and toes, and was able to squat partially.

Id. at 12, R. 473. Dr. Majid assigned the diagnoses of a history of coronary artery disease, congestive heart failure, hypertension, diabetes, hypercholesterolemia, arthritis, obstructive sleep apnea, and obesity. Id. at 12, R. 473. Dr. Majid did not, however, provide any functional limitations. Id.

On July 30, 2015, John presented to Dr. Sultan Niazi for a consultation about his sleep apnea. Dkt. 7-10 at 15-16, R. 476-77. John reported that he had been diagnosed with severe sleep apnea three years prior and that he had tried to use a CPAP machine for a short time, but stopped when his insurance no longer covered it. Id. John reported that he still snores, snorts, and gasps for air, wakes up feeling panicky at night, has apneic episodes, and wakes up feeling tired and sleepy in the morning. Id. John did not report any issues with driving. Id. Dr. Niazi ordered John to complete a split night polysomnogram at the sleep lab and to return in two months once that study had been completed so that they could devise a treatment plan. Id. at 17, R. 478.

On August 13, 2015, a representative from the SSA contacted John to ask about his cardiac symptoms and treatment. Dkt. 7-6 at 24, R. 193. The representative indicated that John had told his cardiologist, Dr. Singh, on June 8, 2015 that he had no cardiac symptoms, but he told the consultative physician on July 6, 2015 that he had biweekly chest pain. Id. John said he had not discussed these symptoms with his cardiologist and instead waited to see how long the episodes lasted on his own; John further noted that he had spoken to his doctor about the symptoms in the past and had been told to use the doctor's personal number if necessary. Id.

On August 20, 2015, a representative from the SSA contacted John to discuss his activities of daily living. Dkt. 7-6 at 25, R. 194. John noted that his activities of daily living were limited due to fatigue and intermittent chest pain. Id. He said that he was able to walk around half of a Wal-Mart store before needing to rest; that he performs household chores throughout the day but must take multiple breaks due to fatigue and that those breaks do not replenish his energy level to normal but do allow him to continue the tasks. Id. John noted that his only scheduled treatment was a sleep study to occur the following week. Id.

On September 2, 2015, Dr. Singh's nurse, Debra Kammerling, LPN, noted that she had received paperwork from the SSA requesting that Dr. Singh conduct an exercise treadmill test because John had indicated that his main complaints were chest pain and shortness of breath on a regular basis. Dkt. 7-10 at 19, R. 480. She further noted that John had denied any chest pain or shortness of breath at his last office visit with Dr. Singh on June 8, 2015[6] and had since cancelled two scheduled sleep studies. Id. Nurse Kammerling contacted John, who confirmed that his symptoms had not changed since he last saw Dr. Singh in June 2015. Id. Nurse Kammerling left a message with the SSA disability reviewer and advised that Dr. Singh would not be performing an exercise treadmill test because John had denied any chest pain or shortness of breath. Id; Dkt. 7-6 at 26, R. 195.

On September 9, 2015, state agency physician Dr. J. V. Corcoran completed a records review on the initial level, and determined that John had impairments of

---

[6] Records of the June 8, 2015 follow-up with Dr. Singh were not provided to the Court.

congestive heart failure, hypertension, and diabetes mellitus. Dkt. 7-3 at 13, R. 63.

Dr. Corcoran concluded that John was not disabled because he had the RFC to

perform light work, with the following limitations: occasionally lift and carry up to

20 pounds; frequently lift and carry up to 10 pounds; stand and walk for about 6

hours in a work day; sit for about 6 hours in a work day. Id. at 14, R. 64.

On December 9, 2015, John underwent a CT scan of the abdomen and pelvis,

which revealed a few diverticula throughout the colon. Dkt. 7-10 at 23, R. 484. On

January 5, 2016, state agency physician Dr. Jerry Smartt, Jr. completed a records

review at the reconsideration level, and determined that John had impairments of

congestive heart failure, hypertension, and diabetes mellitus. Dkt. 7-3 at 24, R. 74.

Dr. Smartt assigned the same limitations as Dr. Corcoran did in September 2015. Id.

On September 20, 2017, John returned to Community Heart and Vascular Care for a

two-year follow-up on his coronary artery disease. Dkt. 7-10 at 28, R. 489. John

discussed his coronary artery disease, diabetes mellitus, and shortness of breath.[7] Id.

### C. ALJ Decision

In determining whether John qualified for benefits under the Act, the ALJ

went through the analysis set forth in 20 C.F.R. § 404.1520(a) and concluded that

John was not disabled. At step one, the ALJ found that John was insured through

December 31, 2017 and had not engaged in substantial gainful activity since his

alleged onset of disability on August 1, 2012. Dkt. 7-2 at 20, R. 34.

---

[7] There are no further notes from the September 20, 2017 visit.

At step two, the ALJ found that John had severe impairments of obesity with a body mass index of 38; history of coronary artery disease/congestive heart failure status-post coronary artery bypass grafting with six stents; hypertension; and diverticulitis. Dkt. 7-2 at 20, R. 19. The ALJ also found that John had non-severe impairments of sleep apnea and diabetes mellitus. Id. at 21, R. 20.

At step three, the ALJ considered John's coronary artery disease under Listing 4.04; hypertension and coronary artery disease under Listing 4.02; and obesity under Listings 1.00Q, 3.00I, and 4.00F pursuant to Social Security Ruling 02-1p. The ALJ determined that John did not meet or medically equal any listing. Dkt. 7-2 at 21-22, R. 20-21.

After step three, but before step four, the ALJ determined that John had the RFC to perform light work, except that he could only occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. Dkt. 7-2 at 22, R. 21.

At step four, relying on the testimony of the vocational expert, the ALJ concluded that John could perform his past work as a restaurant manager. Dkt. 7-2 at 26, R. 25. Accordingly, the ALJ determined that John was not disabled. Id.

## IV.    Analysis

John challenges the ALJ's decision on four grounds. First, he asserts that the ALJ improperly concluded that his sleep apnea, with associated fatigue, is a non-severe impairment. Secondly, he argues that the ALJ failed to address his symptoms of fatigue and drowsiness in her opinion or incorporate them into the RFC

analysis. Third, John contends that the ALJ engaged in an improper Social Security Ruling 16-3p analysis by affording too much weight to John's ability to perform activities of daily living. Finally, John argues that the ALJ failed to account for his exemplary work history. The Court will address each challenge in turn.

## A. Sleep Apnea

First, the Plaintiff argues that the ALJ improperly deemed his sleep apnea a non-severe impairment. Dkt. 9 at 14. John contends that the ALJ impermissibly selected and discussed only the evidence that supported her ultimate conclusion, rather than discussing the evidence that supported his contention that his sleep apnea was a severe impairment. Id. at 16. This failure to discuss the relevant evidence, he argues, is not harmless, because if the ALJ properly deemed his sleep apnea severe and accounted for the associated fatigue, he would be precluded from all employment. Id. at 18.

The Commissioner argues in response that the ALJ properly considered John's impairments and concluded that his sleep apnea was non-severe. Dkt. 15 at 6. The ALJ, he notes, outlined all of John's treatment related to sleep apnea before concluding that the impairment was not severe. Id. at 7. Moreover, the ALJ relied on the opinion of state agency reviewing physician Dr. Jerry Smartt, Jr., who concluded that John's sleep apnea was not a severe impairment. Id. at 8.

The ALJ discussed John's sleep apnea as follows:

In terms of the claimant's sleep apnea, a polysomnography performed in April 2012 evidenced severe complex sleep apnea with severe nighttime oxygen desaturation. The claimant was placed on a CPAP machine at 12 centimeters of water pressure, which relieved his symptoms. However,

he stopped use thing (sic) the CPAP when his insurance company changed. There is little mention of sleep apnea until July 2015, at which time he did complain of feeling tired in the morning. He reported that he slept about six or seven hours per night, but had restless sleep due to the apnea. He denied difficulty driving. The impression was history of obstructive sleep apnea, currently not being treated. An updated sleep study was ordered, but the claimant canceled the study.

Dkt. 7-2 at 21, R. 20. The ALJ further noted that although his sleep apnea is a medically determinable impairment and may be a health concern for John, it does not result in more than minimal work-related restrictions and, therefore, cannot be considered severe. Id.

At step two of the sequential analysis, ALJs are required to determine whether the claimant has an impairment or combination of impairments that are "severe." 20 C.F.R. § 404.1520(a)(4)(ii). The burden, however, is on the claimant to prove that the impairment is severe. *Zurawski v. Halter*, 245 F.3d 881, 885-85 (7th Cir. 2001). As long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process. *Curvin v. Colvin*, 778 F.3d 645, 648 (7th Cir. 2015). Therefore, the step two determination of severity is "merely a threshold requirement." *Castile v. Astrue*, 617 F.3d 923, 926-27 (7th Cir. 2010).

The ALJ outlined all evidence in the record related to John's diagnosis of sleep apnea and concluded that it was not a severe impairment. The record only contains two medical visits where John complains of sleep apnea symptoms and the other visits in the record contain express denials of any sleep apnea symptoms. Dkt. 7-7 at 14, R. 245; Dkt. 7-10 at 15-17, R. 476-78. Both state agency physicians, Dr. Corcoran and Dr. Smartt, Jr., evaluated all evidence in the record and did not consider John's

sleep apnea to be a severe impairment. Dkt. 7-3 at 13-14, 24, R. 63-64, 74. The only other evidence in the record of John's sleep apnea comes from his self-reports. The Seventh Circuit makes clear that ALJs are not required to engage in a credibility determination at step two of the sequential analysis. *Curvin*, 778 F.3d at 649. The ALJ adequately discharged her burden by evaluating the evidence and considering whether any of John's impairments could be considered severe. Because the ALJ found other impairments to be severe, she was correct in proceeding to the remaining steps of the sequential analysis. Moreover, even if there were some type of error at step two, it would have been harmless because, as discussed below, the ALJ properly considered all of John's severe and non-severe impairments, along with the objective medical evidence, John's symptoms, and his credibility, when determining the RFC after step three.

### B. Fatigue

John's second argument is that the ALJ failed to address his severe fatigue and drowsiness in her opinion or in the RFC analysis. Dkt. 9 at 19. John argues that he reported throughout the record his "difficulty with fatigue, drowsiness, chronic tiredness, and decreased energy level." Id. John cites to his testimony at the 2017 hearing, his contact with an SSA representative in August 2015 regarding his activities of daily living, a record from April 2012 where he reports significant daytime drowsiness, a record of his polysomnography in April 2012, a record from November 2013 where John reported to Dr. Houston that his sleep apnea caused fatigue, his report to the consultative examiner in July 2015 that he experienced

14

poor sleep quality, sleep apnea, and no energy, and his report to Dr. Niazi in July 2015 that he experienced tiredness throughout the day. Id. Additionally, John argues that the ALJ presented incomplete hypotheticals to the vocational expert because they did not address his issues with fatigue and tiredness. Id. at 20.

The Commissioner asserts in response that the ALJ adequately considered John's fatigue and drowsiness in her opinion. Dkt. 15 at 9. Moreover, John's fatigue and drowsiness are sufficiently accommodated throughout the opinion and RFC to the extent that those symptoms find support from medical opinions in the record. For instance, state agency physician Dr. Smartt, Jr. indicated that he considered John's sleep apnea history and the 2015 apnea consultation, but determined that fatigue would not impact his ability to perform work as outlined in the RFC. Id. The Commissioner also argues that the ALJ was not required to include any limitations for fatigue in the hypothetical to the vocational expert because those limitations were not supported by substantial evidence. Id. at 10.

Although John seems to argue that the ALJ dismissed his fatigue and drowsiness entirely without any consideration, the ALJ's opinion demonstrates the opposite. The ALJ explicitly mentions every record that John cites to in his attempt to prove that the ALJ ignored his complaints of fatigue. She discusses his complaints of poor sleep and fatigue in 2012 that culminated in a polysomnogram that revealed severe obstructive sleep apnea, Dkt. 7-2 at 21, R. 20; his November 2013 complaints of fatigue to his new primary care physician, Dr. Houston, Id. at 23, R. 22; his Report of Contact from August 2015 where he reported difficulty with activities of daily living due to fatigue, Id. at 25, R. 24; his complaints to the consultative examiner,

Dr. Majid, regarding his fatigue and low energy levels, Id. at 23, R. 22; and his July 2015 complaints to Dr. Niazi about his continued apnea, poor sleep, and fatigue. Id. at 21, R. 20. Additionally, she points out in her opinion that John consistently denied, over a several year period, any symptoms related to sleep apnea, shortness of breath, or fatigue. Dkt. 7-2 at 26, R. 25. Contrary to John's assertions in his brief, the ALJ explicitly considered his sleep apnea, fatigue, and drowsiness.

In an attempt to bolster his claim, John cites extensively to *Allensworth v. Colvin*, 814 F.3d 831 (7th Cir. 2016). That reliance, however, is misplaced. In *Allensworth*, the Seventh Circuit determined that the ALJ did not give proper weight to the claimant's treating physician's opinion on the marked effects of the claimant's sleeplessness and hypersomnia on his ability to concentrate and work at a consistent pace. 814 F.3d at 834. Here, no treating physician provided a medical opinion on John's behalf. The only evidence that John suffers any limitations from sleep apnea or fatigue comes from his self-reported complaints. While this Court understands that it is improper to reject a claimant's subjective complaints solely because there is no or little objective medical evidence in support, *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015), that consideration does not affect the ALJ's proper conclusion here that there is no medical evidence in the record to support any greater limitations related to fatigue. *See* 20 C.F.R. § 404.1512(c) ("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled.").

Relatedly, John argues that the ALJ failed to provide the vocational expert with a complete picture of his limitations by not including any limitations for fatigue

and tiredness in the hypothetical. Dkt. 9 at 20. "In this circuit, both the hypothetical posed to the [vocational expert] and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *see also Shonda S. v. Berryhill*, No. 1:18-cv-00715-JRS-MJD, 2019 WL 1323922, at *7 (S.D. Ind. Mar. 25, 2019) (*citing Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994)). This Court has already determined that the ALJ properly considered John's complaints of fatigue and tiredness and that no further limitations were warranted based on the record at hand, which renders this last argument moot. As noted above, John has failed to support his claims of fatigue and drowsiness with substantial evidence, and thus the ALJ was not required to include any limitations for such conditions in the hypotheticals to the vocational expert.

### C. Credibility Analysis

Third, John argues that the ALJ failed to articulate her application of Social Security Ruling 16-3p in evaluating the credibility of John's symptoms. Dkt. 9 at 22. John appears to argue that the ALJ, when developing his RFC, erroneously determined John to be capable of performing light work based on his activities of daily living. Dkt. 9 at 24. The Commissioner argues that the ALJ engaged in a proper two-step analysis of John's symptoms and came to a conclusion that is supported by the record. Dkt. 15 at 11.

The ALJ's credibility determinations are entitled special deference, *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006), but the ALJ is still required to "build an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*,

226 F.3d 809, 811 (7th Cir. 2000). In evaluating a claimant's credibility, the ALJ must comply with SSR 16-3p and articulate the reasons for the credibility determination. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). SSR 16-3p[8] lays out a two-step process for evaluating a claimant's subjective symptoms: (1) determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms; (2) evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his ability to perform work-related activities. SSR 16-3p, 2017 WL 5180304 at *4.

Here, the ALJ described every medical visit contained in the record and noted that John had diagnoses in the record of hypertension, coronary artery disease, obstructive sleep apnea, obesity, diabetes, chest pain, edema, and status-post coronary artery bypass grafting with six stents. Dkt. 7-2 at 23, R. 22. This undertaking satisfied step one of the SSR 16-3p process.

For step two of the process, in reviewing the medical evidence and testimony presented at the hearing, the ALJ found that John's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects

---

[8] SSR 16-3p became effective on March 28, 2016, (S.S. A Oct. 25, 2017), 2017 WL 5180304, at *2, replacing SSR 96-7p, and requires an ALJ to assess a claimant's subjective symptoms rather than assessing her "credibility." The Seventh Circuit has explained that the "change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original). The standard used to review an ALJ's subjective symptom evaluation remains whether the assessment was patently wrong.

of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Dkt. 7-2 at 25, R. 24. This language, however, is "meaningless boilerplate." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

After citing numerous pages of case law for this argument, John devotes a few sentences to argue how the ALJ's subjective symptom evaluations under SSR 16-3p were patently wrong. Dkt. 9 at 24. Specifically, John appears to argue that the ALJ placed undue weight on John's activities of daily living when determining that he could perform full time light exertion work. Dkt. 9 at 24. Even though the ALJ acknowledged that John was able to "complete hygiene tasks, to prepare meals, shop in stores, drive, go out alone, and do various household chores while taking multiple breaks due to fatigue," John maintains that the ALJ, when assessing John's RFC, failed to consider the "less strenuous" manner in which John was completing these tasks, which resulted in an erroneous subjective symptom evaluation. Dkt. 9 at 24.

SSR 16-3 advises adjudicators that they should consider a claimant's activities of daily living when evaluating the severity of the claimant's symptoms. As the claimant points out, the Seventh Circuit has criticized ALJs who infer an ability to perform full-time work from an ability to perform activities of daily living. *See Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016); *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014); *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). The ALJ, however, did not commit this error here. Although the ALJ summarized John's testimony about his ability to do housework and other tasks, the Court fails to find that she never inferred from those statements that John was capable of full-time

work. *See Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (noting that ALJ discussed claimant's performance of activities of daily living but did not equate it with ability to work).

Here, the ALJ explicitly notes that when considering a claimant's symptoms, she must consider multiple types of evidence, including objective medical evidence; the claimant's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; treatment, other than medication, the individual receives or has received; any measures other than treatment that relieves the pain or symptoms; and any other factors concerning the individual's functional limitations and restrictions. Dkt. 7-2 at 25, R. 24. After exhaustively listing the objective medical evidence, the ALJ went on to consider several of these factors, including John's activities of daily living; the intensity, severity, and frequency of his symptoms; and the type of medication or other treatment used to relieve his symptoms, before determining that John could return to work full-time. Id.

In addition, throughout her opinion, the ALJ noted several inconsistencies in the record that undermine John's contention that his impairments render him unable to work. For example, the ALJ pointed out that John informed the consultative examiner in July 2015 that he experienced regular chest pain and fatigue, but also that he had not informed his treating cardiologist about any of these symptoms or scheduled any follow-up appointments. Dkt. 7-2 at 25, R. 24. John also accuses the ALJ of overlooking the fact that he took breaks when performing these chores, but the ALJ explicitly noted these details in her opinion. Dkt. 7-2 at 25, R.

24. Contrary to John's argument, the ALJ appropriately completed both steps of the SSR 16-3p analysis.

Accordingly, the Court concludes that the ALJ's SSR 16-3p credibility assessment is tied to substantial evidence in the record and is not patently wrong, thus the Court will not disturb that assessment. *See Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015); *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013).

### D. Work History

Finally, John spends one paragraph arguing that because he had a long, steady, and fruitful work history of over 24 years, where he consistently earned in excess of $50,000, he was entitled to a presumption of substantial credibility. Dkt. 9 at 27. It is not the responsibility of the Court to research and construct parties' arguments. "Perfunctory and undeveloped legal arguments are waived . . ." *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016). In lieu of disregarding this argument for a failure to adequately brief the Court, the Undersigned will instead address this claim. The Commissioner responds that an ALJ is not required to discuss a claimant's work history, and that an ALJ's failure to discuss work history is not dispositive. Dkt. 15 at 13.

As noted above, an ALJ's credibility determinations are entitled to special deference. *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). An ALJ is not statutorily required to consider a claimant's work history, but "a claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015). In

*Loveless*, the Seventh Circuit explained that "work history is just one factor among many, and it is not dispositive." *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (citing *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir.1998)) (stating that even though the plaintiff had a good work history, the ALJ's decision as to the plaintiff's lack of credibility was affirmed because the credibility analysis was based on other considerations, such as the Plaintiff's "activities of daily living, his routine, conservative medical treatment since 2011, and many earlier reports of minimal or no pain."). A discussion of these other considerations is necessary because an ALJ's failure to adequately explain her credibility determination by discussing specific reasons supported by the record is grounds for reversal. *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015).

   In assessing John's credibility about the disabling effects of his pain, the ALJ specifically noted several reasons for her credibility assessment, which included various inconsistencies in the record as mentioned above, along with John's ability to perform activities of daily living and the fact that he only needed infrequent treatment for his impairments to remain stable. Dkt. 7-2 at 25, R. 24. John has not demonstrated that the ALJ's SSR 16-3p credibility determination is unreasoned or unsupported by the record, as more extensively discussed in the previous section of this opinion. Accordingly, the ALJ's silence on John's exemplary work history "is not enough to negate the substantial evidence supporting the adverse credibility finding," *Loveless*, 810 F.3d at 508, and this Court finds no reason to overturn the ALJ's assessment.

## V.     Conclusion

For the reasons detailed herein, this Court **AFFIRMS** the ALJ's decision denying Plaintiff benefits. Final judgment will issue accordingly.

So ORDERED.

Date: 1/27/2020

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email